UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------X
STEVE J. KHAN,

        Plaintiff,                    <u>MEMORANDUM AND ORDER</u>

   -against-                         Civil Action No.
                                    CV-03-2411 (DGT)
HIP CENTRALIZED LABORATORY
SERVICES, INC.,

        Defendant.
---------------------------X

TRAGER, J.


    Plaintiff Steve J. Kahn ("Kahn" or "plaintiff") brings this
action against defendant HIP Centralized Laboratory Services,
Inc. ("CLS" or "defendant"), pursuant to the Age Discrimination
in Employment Act, 29 U.S.C. § 623(a), <u>et</u> <u>seq.</u> ("ADEA") and Title
VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.
§ 2000e <u>et</u> <u>seq.</u> ("Title VII").  On March 27, 2006, defendant's
motion for summary judgment addressing the first two of
plaintiff's four causes of action was granted in part and denied
in part.[1]  On May 18, 2006, defendant's request to file a second
motion for summary judgment on plaintiff's two remaining causes
of action was granted.  These two causes of action allege that

---

    [1]  The March 27, 2006 decision granted defendant's motion
for summary judgment with respect to plaintiff's discrimination
claims under the ADEA, and denied defendant's motion for summary
judgment with respect to plaintiff's retaliation claims under
Title VII and the ADEA.  <u>Kahn v. HIP Centralized Lab. Servs.,</u>
<u>Inc.</u>, No. 03-cv-2411, 2006 WL 842916 (E.D.N.Y. March 26, 2006)
(hereinafter "<u>Kahn I</u>").

plaintiff was subjected to a hostile work environment on account of his age and on account of the fact that he filed complaints of discrimination with his supervisor, local and federal administrative agencies and in federal court.

## Background

Construed in the light most favorable to plaintiff, the non-moving party, the facts are as follows.[2]

Plaintiff has worked for CLS, a not-for-profit medical testing laboratory, since November 1970, and remains employed there. He has worked in several departments throughout his tenure at CLS.[3] In 1970, plaintiff was hired by CLS as a licensed technician.[4] In 1974, Kahn began working in the Hematology Department, where he remained for approximately five or six years. (Oct. 22, 2004 Dep. of Steve J. Kahn ("Khan Tr.") at 32.) Next, Kahn worked in the Chemistry Department for

---

[2] Kahn submitted an affidavit, dated September 25, 2004, which tracks, almost verbatim, paragraphs eleven through forty-five of Kahn's Second Amended Complaint. (Defendant's Oct. 26, 2004 letter, Ex. 7, Affidavit of Steve Kahn ("Kahn Aff.").)

[3] A more thorough description of plaintiff's employment history, including his various transfers to departments throughout CLS, is provided in <u>Kahn I</u>.

[4] It appears that plaintiff was out of the country between 1971 to 1973, and returned to CLS in 1974. (Oct. 22, 2004 Dep. of Steve J. Kahn ("Khan Tr.") at 14-20.)

approximately nineteen years under various supervisors, including Susan Tan and Michael Paleos, CEO of CLS.  (Id.)

In 1995, plaintiff spoke to Tan in order to request a one-week bereavement leave to attend the funeral of his brother in Trinidad.[5]  (Khan Aff. ¶ 4.)  Tan informed him that when she spoke with Paleos about the requested leave, Paleos told her that "he did not need the older workers around, especially those with three or more weeks of annual leave because if your work could be performed during an absence of three weeks or more, you are not needed."[6]  (Khan Aff. ¶ 5; Kahn Tr. at 149, 157.)  Plaintiff was also told by another employee, Cherie Eng, that Paleos told her that "he didn't want people like [Khan] . . . around because [they] have five week vacation."[7]  (Khan Tr. at 115, 149.)  In August 1995, a week after plaintiff returned from his bereavement leave, he was transferred by Paleos, his supervisor at the time, to Client Services.  (Id. at 31.)

Plaintiff alleges that this transfer to Client Services was

---

[5]  Plaintiff was born on May 9, 1946.  (Khan Aff. ¶ 3.)  In 1995, he was 49 years old.  (Khan Tr. at 192.)

[6]  It should also be noted that at plaintiff's deposition, he asserted that Tan told him that Paleos stated that "he don't want people like you, older workers, who has more than three or five weeks vacation.  If you can go away for that length of time, we can do without you forever."  (Khan Tr. at 147.)

[7]  It does not appear that Kahn deposed or received affidavits from either Tan or Eng regarding these comments.  As such, these statements are likely inadmissible hearsay.

a demotion from his prior position as a laboratory technician. Upon moving to Client Services, plaintiff was placed on probation.[8]  On January 16, 1996, Janet Gherradi, a new Client Services manager, extended plaintiff's probationary period in Client Services by an additional four weeks.  (Aff. of Sharon Greenberg in Support of Def.'s Second Mot. for Summ. J. ("Greenberg Aff."), Ex. A.)

According to plaintiff, "both in 1995 and 1996, Mr. Paleos had told me that he was going to get rid of me because he did not want older workers."[9]  (Kahn Aff. ¶ 19.)  At some point between March 23, 1996 and April 8, 1996, plaintiff confronted Paleos and informed Paleos that he planned to file an EEOC claim.[10]  (Kahn Tr. at 228.)  Plaintiff "told [Paleos] that I figured out what he was doing with older workers . . . . So I was going to take it to

[8] It appears that CLS's employment contract authorizes the company to place employees on probation for a period of time when they commence work in another department.  (Kahn Tr. at 172.)

[9] Plaintiff's affidavit refers to one specific incident where Kahn alleges that Paleos, during a conversation about Kahn's union, told Kahn that "[he] was getting rid of the older workers and would get rid of me."  (Khan Aff. ¶ 19.)  In discussing this exchange at his deposition, plaintiff alleged that Paleos told him "that he would get rid of [Kahn].  He didn't want the workers around.  We were a liability to the company." (Khan Tr. at 145.)

[10] In his affidavit, Kahn does not state that he informed Paleos that planned to file an EEOC claim.  Rather, Kahn's affidavit states that Kahn "complained to Mr. Paleos that [he] was being demoted because of [his] age and that [Paleos] was getting rid of older workers."  (Kahn Aff. ¶ 22.)

the EEOC. I was going to file a complaint against him." (Kahn Tr. at 231.) According to plaintiff, Paleos responded that he would "get rid of [him], one way or another".[11] (Id. at 227-32, 239-40.)

Plaintiff also maintains that twice in 1996, while he was working in Client Services, Gherradi, his supervisor in Client Services, said to him, "Don't let that grey beard fool you. You're not too old to start over."[12] (Khan Aff. ¶ 9.) Plaintiff maintains that these comments were made immediately after Gherradi spoke to Paleos about plaintiff. Additionally, plaintiff alleges that after he complained to Paleos about discrimination, Gherradi began to ignore him. Plaintiff also claims that Gherradi would, when greeting plaintiff and his female co-workers, say "Good morning Ladies, Good afternoon Ladies," despite plaintiff's presence. (Kahn Tr. at 205.) Additionally, plaintiff alleges that, during his tenure in Client

---

[11]   It should be noted that plaintiff did not mention this incident in either of his affidavits. There is no mention of this threat when plaintiff describes his informal complaint to Paleos. (Khan Aff. ¶ 22; Affidavit of Steve Khan in Opp. to Def.'s Mot. for Summ. J., dated June 9, 2005, ("Khan's 2d Aff.") ¶ 8.) Interestingly, in his affidavits, Khan mentions that Paleos said that he "would get rid me" in reference to a completely unrelated dispute involving his union. (Khan Tr. ¶ 19; Khan's 2d Aff. ¶ 10.)

[12]   At plaintiff's deposition, he failed to mention the "greybeard" comment. More significantly, plaintiff testified at his deposition that "once [Gherradi] said to me, 'Don't let him [Paleos] fool you. You're not too old to start over.'" (Khan Tr. at 222) (emphasis added.)

Services, he was taken "advantage of" and "swamped" with work. (Khan Tr. at 170.) Specifically, plaintiff avers that his fellow employees would forward many calls to him because as a technician, he was the most qualified employee. (Id.)

On April 8, 1996, Gherradi informed plaintiff that he was being suspended for five days because he failed to call in a positive throat culture on March 4, 1996 and failed to call in a "panic value" on March 23, 1996. The facts surrounding this suspension are explained in more depth in Kahn I, 2006 WL 842916, at *3.

Shortly after confronting Paleos and threatening to file an EEOC complaint, plaintiff dual filed, on April 24, 1996, his first formal complaint with the New York City Commission on Human Rights (the "NYCCHR") and the EEOC, alleging that he was subjected to disparate treatment, including being demoted from a laboratory technician to a client services representative, being put on probation, being cited for unsubstantiated performance deficiencies and being suspended. (Affirm. of Richard J. Reibstein in Support of Def.'s Second Mot. for Summ. J. ("Reibstein Aff."), Ex. C.) Plaintiff charged that he was discriminated against because of his color, race, gender and national origin in violation of both local and federal law. (Reibstein Aff., Ex. C.)

On May 1, 1996, plaintiff dual filed a Verified Amended

Complaint with the NYCCHR and the EEOC and included the allegation that on or about April 30, 1996, defendants demoted him from full-time to part-time employment in retaliation for plaintiff's aforementioned complaint. (Reibstein Aff., Ex. D.) On November 10, 1997, plaintiff filed a Second Amended Verified Complaint with the NYCCHR and EEOC, which raised, for the first time, allegations of age discrimination. (Reibstein Aff., Ex. E ¶ 4.)[13]

On or about May 2, 1996, plaintiff was moved from Client Services to the Microbiology Department. (Kahn Aff. ¶ 24.) As part of this transfer, plaintiff's schedule was changed, requiring him to work Mondays, Tuesdays and Thursdays from 4:00 p.m. until 8:00 p.m. and Saturdays from 1:00 p.m. until 5:00 p.m. (Id.) This change caused plaintiff to lose three hours of a work a day, resulting in a decrease in pay. Furthermore, plaintiff was given only two days notice of this transfer; plaintiff claims this violated his union contract, which requires two weeks notice of any shift change. (Id.; Kahn Tr. at 219, 245.)

Plaintiff worked as a laboratory technician in Microbiology until March 1997 when he was transferred to the Accessioning Department to work as a laboratory aide. Plaintiff's supervisor

--------

[13] Defendant maintains that plaintiff filed this complaint on November 10, 1997, which is the date found on the complaint. Plaintiff denies that it was filed on that date, but fails to offer any evidence to the contrary.

in the Accessioning Department was Marie Hraich.  On November 19, 2001, plaintiff was briefly reassigned as a laboratory technician.  However, after plaintiff failed to pass his probationary period, he was transferred back to the Accessioning Department, where he is currently employed.

Plaintiff was disciplined several times while working in the Accessioning Department.  In December 2002, plaintiff received an employee warning and disciplinary action notice for entering an incorrect total volume and improperly processing a sample. (Greenberg Aff., Ex. B.)  The Employee Warning memorandum for this incident lists four prior "counselings" and one verbal action taken against plaintiff between September 2002 and December 2002.  (Id.)  In August 2003, plaintiff received another employee warning and disciplinary action notice for failing to properly follow CLS scanning protocols.  (Greenberg Aff., Ex. C.)

On May 6, 2003, plaintiff filed suit in federal court.  On April 8, 2004, plaintiff filed a Second Amended Complaint.


**Prior Decision**

On March 27, 2006, Kahn I granted defendant's summary judgment motion regarding plaintiff's age discrimination claims. Summary judgment, however, was denied on plaintiff's retaliation claims, which covered plaintiff's suspension, transfer to the Microbiology Department and transfer to the Accessioning

8

Department.  <u>Kahn I</u> concluded that the strong temporal proximity between the first two actions and defendant's protected activities precluded summary judgment.  Regarding the third action, <u>Kahn I</u> found a causal connection between this transfer and defendant's complaints based upon the fact that plaintiff was transferred a month before other employees in his department. <u>Kahn I</u> denied summary judgment regarding plaintiff's hostile work environment claims because the issue was not briefed by the parties.

## Discussion

## (1)

## Exhaustion of Administrative Remedies

Defendant argues that plaintiff failed to exhaust his administrative remedies because he raised hostile work environment claims in his court complaint but not in his initial administrative charges of discrimination with the NYCCHR and the EEOC.  It is not necessary to decide this issue, because, for the reasons set forth below, plaintiff's age-based hostile work environment claim fails on the merits.  <u>See</u> <u>Oparaji v. United</u> <u>Fed'n of Teachers</u>, 418 F. Supp. 2d 139, 146-147 (E.D.N.Y. 2006) (refusing to address exhaustion claims where claims failed on the

merits);  Del Franco v. New York City Off-Track Betting Corp.,
429 F. Supp. 2d 529, 541 (E.D.N.Y. 2006) (same); see also Francis
v. City of New York, 235 F.3d 763 (2d Cir. 2000) (holding that
Title VII's exhaustion requirements are not jurisdictional).


**(2)**

**Age-Based Hostile Work Environment Claim**


Under Title VII, a hostile work environment exists where
"the workplace is permeated with discriminatory intimidation,
ridicule, and insult, that is sufficiently severe or pervasive to
alter the conditions of the victim's employment and create an
abusive working environment."  Harris v. Forklift Sys., Inc., 510
U.S. 17, 21 (1993) (citation omitted).  "As a general rule,
incidents must be more than episodic; they must be sufficiently
continuous and concerted in order to be deemed pervasive.
Isolated acts, unless very serious, do not meet the threshold of
severity or pervasiveness."  Alfano v. Costello, 294 F.3d 365,
374 (2d Cir. 2002); see also Richardson v. N.Y. State Dep't of
Corr. Servs., 180 F.3d 426, 437 (2d Cir. 1999) ("isolated, minor
episodes of harassment do not merit relief under Title VII")
(quoting Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997))).
In evaluating a hostile work environment claim, courts should
consider "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. Furthermore, the conduct that creates a hostile work environment must be motivated by the plaintiff's protected characteristic. See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work . . . through subjection to a hostile work environment . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic."). Hostile work environment claims brought under the ADEA are analyzed in the same manner as those brought under Title VII. Pronin v. Raffi Custom Photo Lab, Inc., 383 F. Supp. 2d 628, 633 (S.D.N.Y. 2005) (citing Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999)).

Plaintiff contends that he was subjected to a discriminatory hostile work environment on account of his age in violation of the ADEA. Plaintiff avers that the harassment includes the following twelve incidents[14]:

(1) "suspending Plaintiff's employment for five days on trumped up and deliberately fabricated charges that he did not call in a panic valve when he in fact did;"

_____

[14] It must be noted that plaintiff's brief fails to respond, in any manner, to defendant's arguments that plaintiff's age-based hostile work environment claim should be dismissed.

11

(2) "putting Plaintiff on a probationary basis after so many years of employment in order to terminate his employment;"

(3) "requiring Plaintiff to work Saturdays although he had the seniority not to do so;"

(4) "requiring Plaintiff to work split shifts even though it was against Union rules;"

(5) "sending Plaintiff to work in another department without giving him the required two weeks notice;"

(6) "not giving Plaintiff instructions to call a panic valve on the first Saturday he had to work and the[n] alleging that it did and disciplining Plaintiff for alleged failure to follow instructions;"

(7) "Plaintiff was accused of adding two volumes of urine from the same patient with two different ID numbers and was accused of determining that a test could not be done when in fact it could be;"

(8) "Plaintiff was threatened with termination for going to EEOC;"

(9) "being accused of putting some samples in the wrong place and of mixing up samples;"

(10) "Plaintiff is often reminded that he is nothing but a lab aid;"

(11) "Plaintiff was . . . required to do work in violation of company policy in order for CLS to find [an] excuse to

terminate his employment;"

(12) "giving Plaintiff unjustified unsatisfactory

performance letter threatening him with termination."[15]

(Kahn Aff. ¶ 34.)


### a. Alleged age-based comments

Plaintiff alleges that several age-based comments were made
to him by various supervisors.  Plaintiffs points to a number of
seemingly identical comments made by Paleos to Tan, Eng and
plaintiff himself concerning Paleos's belief that he did not
need, or want, older workers around.  As explained in Kahn I,
Paleos's comments mainly focused on seniority rather than age.[16]
"To the extent that [Paleos'] comments were about seniority,
rather than age, animus toward seniority does not create an
inference of discrimination." Kahn I, 2006 WL 842916, at *7
(citing Ludovicy v. Dunkirk Radioator Corp., 922 F.2d 109, 111
(2d Cir. 1990)).  Plaintiff also claims that twice in 1996, while
he was working in Client Services, Gherradi, who was his
supervisor at the time, said to him, "Don't let that grey beard

_____

[15]  Hereinafter, rather than reciting these events, they
will be referred to simply as an "Incident", with the
corresponding accompanying numeral in parentheses.

[16]  Notably, when asked at his deposition whether he
understood Paleos's comments to Tan and Eng to mean that "Paleos
didn't want older workers because they had the three weeks or
more vacation time?", plaintiff responded "yes."  (Khan Tr. at
157.)

fool you.  You're not too old to start over."  (Kahn Aff. ¶ 9.)
As noted in <u>Kahn I</u>, this comment may be interpreted in many ways;
Gherradi may have actually been supportive of Kahn or
complimenting him.  <u>Kahn I</u>, 2006 WL 842916, at *8.  Even if, as
discussed in <u>Kahn I</u>, this comment is interpreted as evidence that
"age was discussed in one of [Gherradi's] conversations with Mr.
Paleos," <u>id.</u>, nothing about the comment is derogatory or suggests
discriminatory animus on the part of Gherradi.

Even assuming that Paleos' comments did evince age-based
animus, they are insufficient on their own to constitute a
hostile work environment.  <u>See</u> <u>Pagan v. New York State Div. of
Parole</u>, No. 98-cv-5840, 2003 WL 22723013, at *6 (S.D.N.Y. Nov.
18, 2003) (holding that four instances of blatantly
discriminatory remarks by a supervisor over the course of several
months were insufficient to establish a hostile work
environment).


**b.  Facially neutral incidents**

In support of his hostile work environment claim, plaintiff
relies on a number of facially neutral incidents and comments in
conjunction with the alleged age-based comments.  "Facially
neutral incidents may be included in the 'totality of the
circumstances' that courts consider in any hostile work
environment claim, so long as a reasonable fact-finder could

14

conclude that they were, in fact, based on" the protected
characteristic at issue, in this instance - age. <u>Alfano</u>, 294
F.3d at 378. "Incidents that are facially sex-neutral may
sometimes be used to establish a course of sex-based
discrimination-for example, where the same individual is accused
of multiple acts of harassment, some overtly sexual and some
not." <u>Id.</u> at 375; <u>see</u> <u>also</u> <u>Howley v. Town of Stratford</u>, 217 F.3d
141, 155-56 (2d Cir. 2000) (concluding that a reasonable fact-
finder could infer that facially sex-neutral incidents were based
on sex-animus where the perpetrator had made prior sexually
derogatory comments). Because Kahn is relying on facially
neutral incidents, he must offer some additional evidence from
which a reasonable jury could infer that these acts were, in
fact, discriminatory. <u>See</u> <u>Pronin</u>, 383 F. Supp. 2d at 634
(rejecting age-based hostile work environment claim where
comments at issue did not reference age and plaintiff offered no
evidence, other than his own speculation, that the comments were
motivated by his age). Before proceeding, it must be noted that,
as previously discussed, it is unclear that Paleos's comments
were indeed age-based. Because, however, on summary judgment all
reasonable inferences must be drawn in favor of the non-moving
party (in this case, plaintiff), Paleos's comments will be
presumed to be age-based. Thus, to the extent that Paleos was
involved in any particular incident, it may, as a threshold

matter, be considered in analyzing plaintiff's hostile work environment claim.

## c.  Incidents excluded from consideration

Incidents (7), (9), (10) and (12), which involve Hraich, plaintiff's supervisor in the Accessioning Department, must be excluded from consideration because there is no evidence from which a reasonable fact-finder could conclude that these incidents were, in fact, based on age.  Critically, plaintiff has not alleged that Hriach made any age-based comments.  Nor has plaintiff shown that Paleos was involved in any of these incidents.[17]  Incidents (7) and (9) involve warnings plaintiff received from October 2002 through December 2002 and a notice he received in December 2002 from his supervisor, Hraich, for entering an incorrect calculation for a test and improperly processing a sample.  (Greenberg Aff. 2 Ex. B.)  In Incident (12), plaintiff claims that he was given an unjustified, unsatisfactory performance letter threatening him with termination.  This appears to be the employee warning and disciplinary action notice Kahn received in August 2003 from Hraich for failing to properly follow CLS scanning protocols. (Greenberg Aff. 2 Ex. C.)  Finally, Incident (10) alleges that

_____

[17] It appears that Paleos was no longer even employed by CLS at the time the incidents involving Hraich occurred.  (Khan Tr. at 176-78.)

plaintiff was often reminded that he is "nothing but a lab aide."
At his deposition, plaintiff mentioned only one incident where
Hraich "harassed him by saying you're nothing but a [lab aide]."
(Khan Tr. at 177.)  Plaintiff provides no context for this
isolated incident.  Not only is plaintiff's title in the
Accessioning Department indeed "lab aide," (Kahn Tr. at 10), but
as noted earlier, Hraich, made no age-based comments.

Additionally, Incidents (1), (3), (4), (5) and (6) must be
excluded from consideration.  Incidents (1) and (6) involve
plaintiff's suspension and defendant's justification for the
suspension.  Incidents (3), (4) and (5) involve the changes in
plaintiff's work schedule caused by the plaintiff's transfer to
Microbiology and defendant's purported failure to give plaintiff
timely notice of that transfer.  Kahn I granted summary judgment
to defendant on plaintiff's age discrimination claims concerning
the suspension[18] and his transfer to Microbiology[19].  Because

---

[18]  In considering plaintiff's suspension, Kahn I concluded
that:

> plaintiff has failed to show that the suspension
> for his failure to perform in his duties was a
> pretext for age discrimination.  He has not argued
> that younger employees were not disciplined for
> similar behavior.  He concedes that he failed to
> perform at least one important duty
> correctly-namely, to call in the "panic" value
> indicating that immediate action was required. Even
> if he actually performed the second duty correctly,
> he has not offered any evidence that the company
> disciplined him because of age-based animus, rather
> than simple factual error.  The statements

Kahn I concluded that there was insufficient evidence for a
reasonable juror to infer that the suspension and plaintiff's
transfer to Microbiology were motivated by age discrimination, it
is inappropriate to consider Incidents (1), (3), (4), (5) and (6)
in determining whether plaintiff was subjected to an age-based
hostile work environment.

    The Second Circuit's decision in Alfano v. Costello, 294
F.3d 365 (2d Cir. 2002), does not compel a contrary result.  The

_____

        attributed to Mr. Paleos and the alleged comments
        by Ms. Gherradi are not sufficient for plaintiff to
        meet his burden where he has not pointed to
        evidence that the nondiscriminatory reason was a
        pretext for discrimination.  Therefore, summary
        judgment is granted as to plaintiff's claims of age
        discrimination in the suspension.

Kahn I, 2006 WL 842916, at *9 (citation omitted).

    [19] In considering plaintiff's transfer to Microbiology,
Kahn I concluded that

        the transfer occurred close in time to when plaintiff
        first filed his discrimination complaints, which may
        indicate that it occurred in retaliation for
        plaintiff's protected complaints.  However, plaintiff
        provides no further evidence to buttress his contention
        that this transfer was age discrimination in the face
        of CLS's proffered reason: that he was only placed in
        Client Services until his seniority date was
        determined.  The statements by Mr. Paleos, allegedly
        made sometime in August 1995 are even farther removed
        in time from the transfer in May 1996.  Without more,
        defendant is also granted summary judgment as to
        plaintiff's claim that this transfer was age
        discrimination.

Kahn I, 2006 WL 842916, at *9.

plaintiff in <u>Alfano</u> alleged sex discrimination under theories of disparate treatment and hostile work environment.  These claims were based on twelve incidents, four of which had an "overtly sexual overtone."  <u>Id.</u> at 370.  At the end of trial, the defendant moved for judgment as a matter of law on both the disparate treatment claim and the hostile work environment claim.  The district court dismissed the disparate treatment claim, but allowed the hostile work environment claim to proceed.  In dismissing the former claim, the district court, after first concluding that the plaintiff failed to show that any of the eight incidents involving personnel actions amounted to an adverse employment action, stated that the plaintiff "had come 'nowhere near raising an inference of discriminatory motive as to each incident' because she failed to show that 'similarly situated male employees received more favorable treatment in each situation of which she complains.'"  <u>Id.</u> at 372.  The district court, however, rejected the defendant's argument that in deciding the hostile work environment claim the jury should not be allowed to consider any of the eight incidents that the court had concluded were insufficient as a matter of law to support the plaintiff's disparate treatment claim.

    On appeal, the Second Circuit affirmed the district court's ruling, explaining that

> [the defendant's] argument fundamentally
> misapprehends what the district court did.  Under

either theory (disparate treatment or hostile work
environment), a plaintiff must prove that she was
singled out for mistreatment because of her sex.
As the district court properly noted, however, the
two theories differ in pleading and in proof.  The
disparate treatment theory requires a finding that
similarly situated people of the other sex were
treated more favorably.  [The plaintiff's] failure
to make that showing precluded a recovery <u>under a
disparate treatment theory</u>.  For the purpose of
that ruling, the district court had no need to
decide whether any or all of the eight personnel
actions were free of sex-based animus as a matter
of law, and the record reflects no such ruling.
Thus, the district court determined that a jury
could reasonably conclude that [the plaintiff] had
been singled out for mistreatment because of her
sex even in incidents as to which there was no
showing that men were treated differently.  This is
a logical possibility that the law acknowledges by
creating two separate theories of recovery.

<u>Id.</u> at 375-76 (emphasis in original, footnote omitted).

<u>Alfano</u> is clearly distinguishable because <u>Kahn I</u> did not

grant summary judgment solely based on plaintiff's failure to

show that similarly situated younger employees received more

favorable treatment.  In reference to plaintiff's suspension,

<u>Khan I</u> noted that plaintiff did not even argue that "younger

employees were not disciplined for similar behavior."  <u>Kahn I</u>,

2006 WL 842916, at *9.  <u>Kahn I</u>, however, also took into account

the fact that plaintiff acknowledged not calling in a "panic

value," as well as the statements of Paleos and Gherradi, in

concluding that plaintiff failed to show pretext.  <u>Id.</u>

Similarly, in denying plaintiff's age discrimination claim

regarding his transfer to Microbiology, <u>Kahn I</u> found that

20

Paleos's comments were insufficient to show that defendant's reasons for transferring plaintiff were pretextual. Thus, because <u>Kahn I</u> concluded that the comments of Paleos and Gherradi were insufficient to show that plaintiff's suspension and transfer were a result of age discrimination, it would be inconsistent to conclude that a reasonable juror could, nonetheless, find, in the context of plaintiff's hostile work environment claim, that Incidents (1), (3), (4), (5) and (6) were based on plaintiff's age.

Critically, there is no suggestion in <u>Alfano</u> that the district court ever considered the impact of the four sexually overt incidents, which are analogous in the instant case to the comments of Paleos, in dismissing the plaintiff's disparate treatment claims.[20] The district court's decision in <u>Alfano</u> was based solely on the plaintiff's failure to show that similarly situated individuals received more favorable treatment. As such,

---

[20] In one incident at issue in <u>Alfano</u>, one of the plaintiff's supervisors laughed after the plaintiff reported an instance of sexual harassment. <u>Alfano</u>, 294 F.3d at 370. That same supervisor later subjected the plaintiff to an allegedly improper (but facially neutral) "informal counseling" session. <u>Id.</u> at 371. It does not appear that the district court ever considered whether the supervisor's prior conduct raised an inference of discrimination regarding the informal counseling session. As such, the Second Circuit found it appropriate to consider the informal counseling session in determining the existence of a hostile work environment (presumably because there may have been a basis for the jury to conclude that this was motivated by the plaintiff's sex and the district court had not explicitly found otherwise). <u>Id.</u> at 378-79.

a denial on that ground, did not, as the Second Circuit stressed, address "whether any or all of the eight personnel actions were free of sex-based animus as a matter of law." Alfano, 294 F.3d at 375. However, because Kahn I considered the comments of Paleos and Gherradi, Kahn I concluded that the suspension and the transfer to Microbiology were free of age-based animus as a matter of law.

Two other incidents must also be excluded, for varying reasons, from consideration. In Incident (8) plaintiff alleges that he was threatened with termination for going to the EEOC. This incident is not germane to plaintiff's age-based hostile work environment claim because it involves discrimination based on plaintiff's protected activity and not his age.

In Incident (11) plaintiff alleges that he was "required to do work in violation of company policy in order for CLS to find an excuse to terminate his employment." (Khan Aff. ¶ 34.) Plaintiff provides no evidence in support of this allegation, nor does he specify which supervisor was trying to terminate his employment.[21] This conclusory allegation is insufficient to defeat a motion for summary judgment. "[P]urely conclusory allegations of discrimination, absent any concrete particulars,"

---

[21] Plaintiff may be referring to his transfer to Microbiology, which required him to work Saturdays and split-shifts, allegedly in violation of his union contract. If this is the case, then the discussion of Incidents (3), (4) and (5) adequately addresses this allegation.

are insufficient to survive a summary judgment motion.  <u>Meiri v.</u>
<u>Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985); <u>Burroughs v. Chase</u>
<u>Manhattan Bank, N.A.</u>, No. 01-cv-1929, 2005 WL 497790, at *5
(S.D.N.Y. Mar. 2, 2005) (citing <u>Mieri</u> and granting summary
judgment motion on hostile environment claim where plaintiff
simply asserted, without support, that her age was the reason why
her supervisor did not like her).

Finally, plaintiff also relies on the fact that he was
"swamped" with work and taken advantage of during his tenure in
Client Services under Gherradi.  Pl.'s Mem. in Opp. to Def.'s
Second Summ. J. Motion at 7.  This increased workload appeared to
be a result of his co-worker's actions.  Plaintiff fails to offer
any evidence suggesting that his co-workers were motivated by
discriminatory animus.[22]

**d.  Remaining incidents**

This leaves only Incident (2), the extension of Kahn's
probationary period, and Paleos's comments that he did not need,
or want, older workers.  While these comments may be evidence of
unlawful intent, the comments and extension of probation, when

---

[22]  At this deposition, Kahn speculated that Paleos was
behind the increased workload.  When asked if "you contend that
Mr. Paleos put these people up to it?", Kahn replied, "Probably.
I got along well with most people.  But when Mr. Paleos came
there, he was crazy."  (Khan Tr. at 224.)  That testimony is
insufficient to connect Paleos to Kahn's increased workload.

taken together, fail to meet the "severe or pervasive" standard
required to prevail on a hostile work environment claim.


### (3)

### Retaliatory Hostile Work Environment Claim


Plaintiff argues that he was subjected to a hostile work
environment in retaliation for his formal and informal complaints
of discrimination.  In order to establish a prima facie case of
retaliation, a plaintiff must demonstrate (1) participation in a
protected activity known to the defendant; (2) a materially
adverse action that might dissuade a reasonable worker from
making or supporting a charge of discrimination; and (3) a causal
connection between the protected activity and the materially
adverse employment action.  <u>Burlington N. and Santa Fe Ry. Co. v.</u>
<u>White</u>, --- U.S. ---, 126 S.Ct 2405, 2415 (2006) (clarifying that
the second prong of a <u>prima</u> <u>facie</u> case of retaliation can be
satisfied by any "materially adverse" actions and not only by
materially adverse employment actions); <u>see</u> <u>also</u> <u>Carmellino v.</u>
<u>District 20 of New York City Dept. of Educ.</u>, No. 03-cv-5942, 2006
WL 2583019, at *5 (S.D.N.Y. Sept. 6, 2006) (stating that "[t]he
rationale of <u>Burlington Northern</u> applies to . . . ADEA
retaliation claims").

There is no dispute that plaintiff participated in

protected activity known to defendant.  At some point between
March 23, 1996 and April 8, 1996, plaintiff made an informal
complaint about age discrimination to Paleos and threatened to
file a complaint with the EEOC.  On April 24, 1996, plaintiff
filed a formal complaint of discrimination with NYCCHR and the
EEOC.  On May 6, 2003, plaintiff filed his first complaint in
federal court.  All three of these actions satisfy the first
prong of plaintiff's prima facie case.

Defendant contends that plaintiff cannot satisfy the second
prong of his prima facie case.  Plaintiff appears to be arguing
that CLS's actions created a hostile work environment, which
qualifies as a "materially adverse" action.  Plaintiff relies on
the same twelve incidents used to support his age-based hostile
work environment claim in advancing his retaliatory hostile work
environment claim.  (Khan Aff. ¶ 34.)

In Richardson v. New York State Dept. of Correctional
Service, 180 F.3d 426, 446 (2d Cir. 1999), the Second Circuit
"adopt[ed] the view that unchecked retaliatory co-worker
harassment, if sufficiently severe, may constitute [an] adverse
employment action so as to satisfy the second prong of the
retaliation prima facie case."[23]  The court in Richardson noted

---

[23]  Although Richardson dealt specifically with co-worker
harassment, there is no dispute that a retaliatory hostile
environment created by an employee's supervisors would also be
cognizable under the various federal discrimination statutes.

that this conclusion was "consistent with our prior cases addressing what constitutes "adverse employment action[s]." <u>Id.</u>

It is, however, unclear whether the Supreme Court's decision in <u>Burlington Northern</u>, 126 S. Ct. 2405, altered the standard for retaliatory hostile work environment claims. In <u>Burlington Northern</u>, the Court held that Title VII retaliation plaintiffs are only required to show a "materially adverse" action, and not an "adverse employment action," in order to establish a <u>prima facie</u> case of retaliation. Courts have assumed that in order to show a retaliatory hostile work environment, a plaintiff must show that the "incidents of harassment following complaints were sufficiently continuous and concerted to have altered conditions of an employee's employment."[24] <u>Thomas v. iStar Fin., Inc.</u>, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006) (post-<u>Burlington Northern</u>); <u>see also</u> <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 341 (3d Cir. 2006) (noting that because retaliation plaintiffs were, prior to <u>Burlington Northern</u>, required to show an adverse employment action, "[e]mployees claiming retaliation by workplace

---

[24]  In <u>Reilly v. Metro-North Commuter R.R. Co.</u>, No. 93-cv-7317, 1996 WL 665620, at *10 n.22 (S.D.N.Y. Nov. 15, 1996), which was decided prior to <u>Burlington Northern</u>, the court noted that because a retaliation claim "requires a showing of an employment action 'disadvantaging' plaintiff, rather than one that is 'adverse[,]' [t]he language of the prima facie standard for retaliation claims arguably requires a lesser showing than that for discrimination claims." Despite noting this discrepancy, the court still found "the 'hostile work environment sexual harassment cases' [to be] instructive." <u>Id.</u>

harassment, therefore, were required to show retaliatory
harassment that was 'severe or pervasive enough to create a
hostile work environment' that would violate the
anti-discrimination provision of Title VII in order to violate
Title VII's protection from retaliation.") (citing <u>Jensen v.
Potter</u>, 435 F.3d 444 (3d Cir. 2006)).  That is the standard
traditionally used in considering hostile work environment claims
based on gender, race and other protected characteristics.  <u>See
Harris</u>, 510 U.S. at 21 (holding that to establish a hostile work
environment, the conduct at issue must be sufficiently "severe or
pervasive to alter the conditions of the victim's employment and
create an abusive working environment."); <u>Alfano</u>, 294 F.3d at 374
(stating, in the context of a sex-based hostile work environment
claim, that "[a]s a general rule, incidents must be more than
episodic; they must be sufficiently continuous and concerted in
order to be deemed pervasive.").

     After <u>Burlington Northern</u>, the question arises whether the
threshold standard for retaliatory hostile work environment
claims should no longer be tethered to the traditional hostile
work environment standard because retaliation plaintiffs must
only show a "materially adverse action" and not an "adverse
employment action."  Because only a "materially adverse" action
is required, plaintiffs attempting to show a retaliatory hostile
work environment could potentially survive summary judgment by
showing that they were subjected to conduct, which although

objectionable enough that it "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination,'" Burlington N., 126 S. Ct. at 2415 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)), did not meet the "severe or pervasive" threshold ordinarily required in hostile work environment claims. In order to be actionable, hostile work environments traditionally had to be "sufficiently severe or pervasive to alter the conditions of [plaintiff's] work environment." Meritor, 477 U.S. at 67 (emphasis added). However, because materially adverse actions are defined as those actions that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination,'" Burlington N., 126 S. Ct. at 2415, such actions do not have to alter the terms and conditions of employment. As such, a lower standard for retaliatory hostile work environment claims may be appropriate. Courts have yet to address this point. See Thomas, 438 F. Supp. 2d at 365 (noting, post-Burlington Northern, that "[a] hostile work environment could also constitute a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII"); Pasternak v. Baines, No. 00-cv-0369, 2006 WL 2570982, at *7 (W.D.N.Y. Sept. 5, 2006) (dismissing, post-Burlington Northern, retaliatory hostile work environment where allegations were not "of such a severe and continuous nature that it would have altered the conditions of plaintiff's employment"). Ultimately, however, there is no

reason to decide this issue, as it was not raised by plaintiff.
See Pl.'s Mem. in Opp. to Def.'s Second Summ. J. Motion at 4
(stating that "[i]n order to prevail on a hostile work
environment claim, a plaintiff must show that the harassment was
sufficiently severe or pervasive to alter the conditions of the
victim's employment") (citing Alfano, 294 F.3d 365).
Furthermore, and more importantly, all of the incidents that were
potentially based on plaintiff's protected activities are
actionable themselves because each of them is either already
proceeding to trial under Kahn I or is an independent "materially
adverse" action.

As an initial matter, a number of incidents must be
excluded from consideration because plaintiff cannot show any
causal connection between the incident and plaintiff's protected
activity.  Because Incident (2), the extension of plaintiff's
probationary period, occurred prior to plaintiff's first
complaint to Paleos in March 1996, plaintiff is unable to show
that this action was retaliatory.  Incidents (7), (9), (10) and
(12) all involve Hraich, who did not make any remarks regarding
plaintiff's protected activity.  Furthermore, with regard to
these incidents, plaintiff is unable to show any causal
connection based on temporal proximity.  Incidents (7) and (9)
both occurred in 2002, five years after plaintiff's previous
protected activity, the filing, on November 10, 1997, of
plaintiff's Second Amended Verified Complaint with NYCCHR and the

EEOC. Similarly, plaintiff is unable to raise an inference of discrimination based on the temporal proximity of Incident (12) and plaintiff's filing of his suit in federal court on May 6, 2003. As an initial matter, the three-month gap between Incident (12) and the filing of plaintiff's suit in federal court is too long to raise an inference of discrimination based solely on temporal proximity.[25] Furthermore, the fact that Hraich had disciplined plaintiff at least twice in the months <u>prior</u> to the filing of the May 6, 2003 complaint undermines any potential casual connection based solely on temporal proximity. Finally, with regard to Incident (10), the comment about plaintiff being nothing more than a lab aide, plaintiff has failed to show any causal connection between this comment and his protected activity. Because plaintiff does not explain when this comment was made, it cannot be shown that it occurred in close temporal proximity to one of his protected activities.[26]

As explained previously in the discussion of plaintiff's age-based hostile work environment claim, Incident (11), which alleges that "[p]laintiff was . . . required to do work in

---

[25] Generally, district courts in the Second Circuit have found that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line." <u>Cunningham v. Consol. Edison Inc.</u>, 03-cv-3522, 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (collecting cases).

[26] Furthermore, this comment would not qualify a "materially adverse" action.

violation of company policy in order for CLS to find [an] excuse to terminate his employment," must be excluded as a conclusory allegation. Plaintiff also argues that he was "swamped" with work and taken advantage of during his tenure in Client Services because of his protected activity. Plaintiff, however, cannot show any link between this incident and his protected activity. Critically, plaintiff fails to identify when this conduct occurred. Plaintiff was employed in Client Services from August 1995 until May 2, 1996. The great majority of plaintiff's tenure in Client Services occurred prior to his first protected activity on March 23, 1996. Furthermore, as discussed previously, plaintiff's increased workload appeared to be a result of his co-worker's actions. Plaintiff fails to offer any evidence suggesting that his co-workers were motivated by retaliatory animus.

As plaintiff concedes, his claim of retaliation based on his suspension is already proceeding to trial. This claim will necessarily examine defendant's allegation that plaintiff failed to call in a panic value, which, along with another incident of alleged misconduct, was the reason behind the suspension. As such, Incidents (1) and (6) will be litigated at trial.

Similarly, Incidents (3), (4) and (5), which were part and parcel of defendant's transfer to the Accessioning Department, will be litigated as part of defendant's retaliation claim concerning that transfer. As such, there is no reason to

determine whether any of these incidents are independently actionable "materially adverse" actions.  See Burlington N., 126 S.Ct. at 2415 (adopting a case-by-case approach and noting that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children.");  Guerrero v. Lowe's Home Centers, Inc., 462 F. Supp. 2d 399, 410 (W.D.N.Y. 2006) (finding transfer materially adverse where plaintiff was "required to work shifts that were sometimes earlier and sometimes later than her previous schedule, as well as some weekends" and plaintiff was the mother of school-age children)

The only remaining incident is Paleos's comment that he would "get rid of [plaintiff], one way or another."[27]  Although Paleos's comment did not explicitly mention plaintiff's protected activity, the statement was made immediately after plaintiff informally complained to Paleos about age discrimination.  Under those circumstances, a reasonable juror could infer that Paleos was threatening to fire or transfer plaintiff in response to plaintiff's informal complaint of age discrimination. Furthermore, a threat to terminate plaintiff qualifies as a "materially adverse" action.  See Thomas, 438 F. Supp. 2d at 366 (stating that "threats . . . could potentially be a materially adverse action," but finding no materially adverse action where

---

[27]  This comment appears to be the threat referenced in Incident (8).

threats were either not made directly to plaintiff or did not clearly imply that plaintiff would be fired). As such, a jury should decide whether Kahn was threatened with termination for his informal complaint of age discrimination.

## Conclusion

For the foregoing reasons, defendant's second motion for summary judgment is granted in part and denied in part. With respect to plaintiff's age-based hostile work environment claim, defendant's motion is granted. With respect to plaintiff's retaliation claims, plaintiff can proceed to trial on Paleos's threat of termination, as well as on the suspension and two transfers discussed in <u>Kahn I</u>.

Dated:     Brooklyn, New York
           March 30, 2007


                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge