UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------X

STEVE J. KHAN,

      Plaintiff,             MEMORANDUM AND ORDER

  -against-               Civil Action No.
                             CV-03-2411 (DGT)

HIP CENTRALIZED LABORATORY
SERVICES, INC.,

      Defendant.

--------------------------X

TRAGER, J.

The parties are presumed to be familiar with the facts of
this case, which are recounted in two previous opinions. See
Khan v. HIP Centralized Lab. Servs., No. 03-cv-2411, 2006 U.S.
Dist. LEXIS 19641 (E.D.N.Y. Mar. 27, 2006) ("Khan I"); Khan v.
HIP Centralized Lab. Servs., No. 03-cv-2411, 2007 U.S. Dist.
LEXIS 23721 (E.D.N.Y. Mar. 30, 2007) ("Khan II").  Khan I and
Khan II dismissed a number of claims made by plaintiff Steve J.
Khan ("Khan" or "plaintiff") against his employer HIP Centralized
Laboratory Services, Inc. ("CLS" or "defendant").  Between April
7, 2008 and April 11, 2008 a trial was held on the remaining
claims of retaliation and retaliatory hostile work environment
under Title VII of the Civil Rights Act of 1964 ("Title VII") and
the Age Discrimination in Employment Act ("ADEA").

The jury found for Khan on his retaliation claim under Title VII. The jury awarded Khan $159.21 for lost wages relating to a five-day suspension in April 1996,[1] $200,000 in compensatory damages for emotional and psychological injuries and $11,000 in punitive damages. The jury found that Khan was not entitled to damages for two job transfers within CLS which took place in May 1996 and March 1997. The jury also found for defendant on Khan's ADEA retaliation claim and his retaliatory hostile work environment claims.

Defendants now seek judgment as a matter of law on plaintiff's Title VII retaliation claim; judgment as a matter of law on the punitive damages award; or, in the alternative, a remittitur of the compensatory damages award or a new trial under Rule 59(a)(1)(A).

For the reasons explained below, defendant is denied judgment as a matter of law on liability under Title VII. Defendant is granted judgment as a matter of law on the punitive damages award. In addition, because the compensatory damages awarded for psychological injury are excessive, a new trial on damages will be ordered unless plaintiff accepts a remittitur of the award for emotional distress to $50,000.

---

[1] Khan had previously recouped half of the wages from that suspension in a union arbitration settlement with his employer. <u>See</u> Reibstein Aff. Ex. E.

### Title VII Liability

Defendant has moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), arguing that there is insufficient evidence to support plaintiff's Title VII retaliation claim. When ruling on a motion for judgment as a matter of law, "a district court must consider the evidence in the light most favorable to the non-movant and draw all reasonable inferences the jury could have drawn. The district court may set aside a verdict only where there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture,' or where the evidence overwhelmingly compels a different verdict." Cweklinsky v. Mobil Chem. Co., 364 F.3d 68, 75 (2d Cir. 2004) (quoting Harris v. Niagara Mohawk Power Corp., 252 F.3d 592, 597 (2d Cir. 2001)). See also Fink v. City of New York, 129 F. Supp. 2d 511, 514 (E.D.N.Y. 2001). To prove his retaliation claim, plaintiff must show (1) that he engaged in protected activity under Title VII, (2) that his employer was aware of this activity, (3) that the employer took adverse action against him and (4) that there was a causal connection between the protected activity and the adverse action. Kessler v.

Westchester County Dep't of Soc. Servs., 461 F.3d 199, 206 (2d

Cir. 2006).

The protected activity at issue is a February 23, 1996

letter which Khan sent to Janet Ghirardi, his supervisor in

Client Services, in which Khan complained that Ghirardi

> greeted the other workers in Client Services with
> "Good Morning ladies or Good Afternoon ladies."  I
> continually protested, pointing out to you that I
> was present and that I was a man but this had no
> effect.  You in fact ignored my feelings and my
> protest.
> This has now gone for so long that it is
> affecting my sleep and my job.  I am taking this
> last opportunity to ask you to be fair and treat me
> as an equal employee especially since I have been
> employed by CLS since 1969.

Reibstein Aff. Ex. A.  CLS was unquestionably aware of this

letter, which was cc'd to CLS senior management.  But CLS argues

that this letter was not "protected activity" under Title VII

because Khan could not have had a good faith, reasonable belief

that the conduct he complained of actually violated Title VII.

See Kessler, 461 F.3d at 210; McMenemy v. City of Rochester, 241

F.3d 279, 285 (2d Cir. 2001).  Specifically, CLS argues that

"[o]ne cannot have a good faith reasonable belief that conduct

violates Title VII where the belief is based solely upon a

greeting or a boorish comment or other similar circumstances."

Def.'s Mem. at 13.

This assessment is likely true where the objectionable comment is an isolated or passing incident. However, Khan testified that his supervisor persisted in recognizing only "ladies" even after he complained to her about these comments. Trial Tr. ("Tr.") at 273. Ghirardi's comments may not be enough to create an actionable Title VII sexual harassment claim. But "an employment practice need not actually violate Title VII for the protected activities element of a retaliation claim to be satisfied. The plaintiff is only required to have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII." McMenemy, 241 F.3d at 285. See also Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000) (finding that "even if [plaintiff] has failed to prove that there was a violation of the [Americans with Disabilities Act], the defendant may still have retaliated against [plaintiff] for engaging in protected conduct"); McGrory v. City of New York, No. 99 Civ. 4062, 2004 U.S. Dist. LEXIS 20425, at *30 (S.D.N.Y. Oct. 8, 2004) (finding that plaintiff had a good faith, reasonable belief in his complaints of discrimination, because "[w]hile the jury correctly concluded that there was insufficient evidence of a racially hostile work environment, the [defendant employer] has not shown that there was a reason for a layman such as [plaintiff] to have known that

such isolated acts were insufficient to establish his entitlement to relief"). Drawing all inferences in favor of plaintiff, the jury could find that Khan reasonably believed that his complaints about Ghirardi's comments were a protected activity, in light of the evidence that these comments persisted even after Khan told Ghirardi that her reference to Khan and his co-workers as "ladies" made him feel as if he was being discriminated against in his workplace on the basis of his gender.

Both cases cited by defendant in support of its motion for judgment as a matter of law on this point are distinguishable. The plaintiff in <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268 (2001), objected when her supervisor repeated and joked about an offensive comment that appeared in the psychological evaluation of a job applicant. <u>Id.</u> at 269. The plaintiff later claimed that she was fired in retaliation for her complaints about this incident. The Supreme Court found that she could not make out a Title VII retaliation claim because "[n]o reasonable person could have believed that the single incident recounted above violated Title VII's standard." <u>Id.</u> at 271. Where <u>Breeden</u> involved a single isolated incident, however, Khan alleges that his supervisor <u>repeatedly</u> made these comments. Where the supervisor in <u>Breeden</u> was only repeating out loud an offensive statement that appeared in a work-related report, there was no legitimate

work-related basis for the comments of Khan's supervisor.  And whereas the comments in Breeden were not directed toward anyone in particular, Khan claims that Ghirardi's comments were directed toward him, and that they "just continued" even after Khan complained to Ghirardi about her repeated references to "ladies." Tr. at 273.

Holmes v. Long Island Rail Road Co., No. 96-cv-6196, 2001 U.S. Dist. LEXIS 10431 (E.D.N.Y. June 4, 2001), is also distinguishable.  In Holmes, the court found that plaintiff's complaints were not a "protected activity" because the objectionable conduct -- which consisted of sexually suggestive comments made by a physical therapist employed by LIRR during four isolated visits -- could not reasonably rise to the level of a hostile work environment under Title VII.  Id. at *18-19. Holmes, however, emphasized that the physical therapist was "not a senior company official whose conduct should be imputed to" the employer.  Id. at *15.  Moreover, the offensive conduct ceased as soon as that plaintiff filed a complaint pursuant to her employer's anti-discrimination policies.  Id. at *15-16.  It was in light of such facts that the court found that plaintiff's "belief that she had been subjected to a hostile work environment was not objectively reasonable."  Id. at *18-19.  Khan, however, is objecting to comments being made by his direct supervisor, not

just a fellow employee.  Even if Ghirardi's comments were not intended to be offensive, they apparently persisted even after Khan complained about them.  There is also no indication that CLS responded to Khan's letter by addressing and trying to resolve his complaints, unlike the employer in <u>Holmes</u>.

Accepting that Khan's February 23, 1996 letter to CLS was protected activity, there is no question that the evidence presented at trial, when viewed in the light most favorable to plaintiff, is sufficient to uphold the jury's verdict.  Khan's suspension is obviously an adverse action.  Moreover, the jury could easily conclude that a week-long suspension without pay was excessive under the circumstances.  Khan was suspended as a result of two separate incidents in March 1996.  First, on March 4, 1996, Khan allegedly failed to call in a panic value,[2] specifically a positive throat culture, leading a patient to complain to HIP Member Services.  <u>See</u> Reibstein Aff. Ex. C.  This incident did not initially prompt any disciplinary measures. Second, on Saturday March 23, 1996, Khan failed to pick up a log of panic values and make the requisite follow-up phone calls. Janet Ghirardi initially gave Khan a verbal warning for this error.  On April 3, 1996, Ghirardi also sent a memo to Khan,

---

[2] A panic value is a lab result that falls outside an acceptable range, so that a physician must be notified about the lab result immediately.  <u>See</u> Tr. at 139-40.

which was cc'd to CLS management, confirming their conversations about these two incidents and noting other complaints about Khan's work performance. Reibstein Aff. Ex. C. Then, on April 8, 1996, following the verbal warning and the written memo, Khan was suspended for a full week without pay by personnel manager Cherie Eng "[f]or failure to call in a positive throat culture on March 4, 1996 [and for] failure to pick up the panic logs to call them in to the centers on Saturday, March 23, 1996." Reibstein Aff. Ex. D.

CLS claims that the disciplinary measures taken were appropriate given the severity of Khan's mistakes. Tr. at 57-58; 100-01. Khan, however, denies that he failed to call in the panic value on March 4, 1996. Tr. at 284-88. Khan also testified that he had never worked on a Saturday before March 23,1996, and that his supervisor had never told him that Saturday's work included picking up the panic logs. Tr. at 280-82. In other words, Khan claims that he lost a week's pay for a mistake he did not make, and for failing to perform a task that he was not told to perform. The jury evidently found Khan's testimony to be credible and convincing on this issue. This evidence is more than sufficient to allow a jury to conclude that CLS's discipline of Khan was excessive, and that Khan was being singled out for punishment.

The evidence is also sufficient to support causation. Khan sent his letter to Ghirardi, complaining about his treatment in Client Services, about six weeks before his suspension. This temporal proximity is sufficiently close to allow the jury to find that the suspension was retaliatory, as Khan argued at trial. See Tr. at 291. By comparison, courts have found that actions taken two to three months after a protected activity are sufficiently close in time to support a prima facie case of retaliation, even in the absence of other evidence suggesting retaliation. See Woods v. Enlarged City Sch. Dist. of Newburgh, 473 F. Supp. 2d 498, 529 (S.D.N.Y. 2007) (collecting cases); Cunningham v. Consol. Edison, Inc., No. 03-cv-3522, 2006 U.S. Dist. LEXIS 22482, at *55 (E.D.N.Y. Mar. 28, 2006) (reviewing cases to conclude that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"); McGrory v. City of New York, No. 99 Civ. 4062, 2004 U.S. Dist. LEXIS 20425, at *23-27 (S.D.N.Y. Oct. 8, 2004) (denying defendant employer's JMOL motion, because a jury may reasonably find causation in a retaliation case based on "a close temporal nexus between the protected activity" and the adverse action).

In defense of its actions, CLS provided testimony that Khan's suspension was prompted by the severity of his errors, and

not his earlier letter to Ghirardi.  Michael Paleos, who was the

head of CLS at the time of Khan's suspension, testified (in a

videotaped deposition played for the jury at trial) that Khan's

suspension in April 1996 was not retaliatory.  Deposition of

Michael Paleos, dated Feb. 13, 2008, at 27-28.  This testimony is

buttressed by the fact that Ghirardi, about whose conduct Khan

complained, had initially only issued warnings about his errors.

Based on this testimony, a factfinder could conclude that CLS had

a legitimate reason for Khan's suspension that was not merely

pretext for unlawful retaliation.  However, the jury was entitled

to make its own judgments as to the credibility of the evidence

at trial.  Drawing all reasonable inferences in favor of

plaintiff, the timing of Khan's suspension was sufficient to

allow a jury to conclude that Khan was suspended on April 8, 1996

in retaliation for his complaints to CLS management on February

23, 1996 about his treatment at work.

It is, however, somewhat surprising that the jury found Khan

was suspended in retaliation for his complaints of sex

discrimination, which had been delivered about a month and a half

before Khan's suspension, because there was an intervening

incident.  Khan's retaliation claim survived summary judgment

because his suspension followed shortly on the heels of a

conversation (sometime in late March or early April of 1996)

where Khan told CLS Chief Operating Officer Michael Paleos that he was going to file a complaint over CLS's treatment of older workers. <u>Khan I</u>, 2006 U.S. Dist. LEXIS 19641, at *31-32. In light of this chronology, it would appear that Khan had a somewhat stronger claim for retaliation under the ADEA rather than Title VII. "That the Court or others may disagree with the verdict, however, does not entitle [defendant] to judgment as a matter of law." <u>McGrory</u>, 2004 U.S. Dist. LEXIS 20425, at *27. The evidence remains sufficient to uphold the jury's verdict on the Title VII retaliation claim. Accordingly, defendant's motion for judgment as a matter of law on this claim is denied.

## (2)

### Punitive Damages

Defendant also seeks judgment as a matter of law on the $11,000 punitive damages award. In order to be liable for punitive damages under Title VII, an employer must act with malice or with reckless indifference to its employee's federally protected rights. <u>Kolstad v. American Dental Ass'n</u>, 527 U.S. 526, 535 (1999). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." <u>Id.</u> Thus, in order to prove a malicious or

reckless violation of federal law, a plaintiff must provide evidence to show that the employer "retaliated against [the employee] with the conscious knowledge it was violating the law," or "evidence of 'egregious' or 'outrageous' conduct from which an inference of malice or reckless indifference could be drawn." Farias v. Instructional Systems Inc., 259 F.3d 91, 102 (2d Cir. 2001).

As noted above, the evidence is sufficient for the jury to conclude that CLS intentionally singled out Khan for retaliatory mistreatment. But there is insufficient evidence to show that CLS actually believed it was singling out Khan on the basis of his gender or his protected complaints. In other words, although CLS may have intentionally retaliated against Khan, CLS did not believe that its actions were in retaliation for activity that were protected by Title VII. Instead, the record suggests that CLS believed that this suspension was lawful, much like the job transfers which were found by the jury to be lawful activity, because CLS believed that the decision to suspend Khan was based on the legitimate business concern that he failed to notify doctors about adverse test results. Therefore, because CLS did not intend to violate Khan's federally-protected rights, it was not acting with a sufficient level of intent to entitle Khan to punitive damages. See Weissman v. Dawn Joy Fashions, Inc., 214

13

F.3d 224, 234-36 (2d Cir. 2000) (finding that evidence was
sufficient to support a jury verdict on retaliation claims, but
insufficient to support an award of punitive damages, where the
employer lacked the requisite subjective intent to retaliate
against its employee); D'Ascoli v. Roura & Melamed, No. 02 Civ.
2684, 2005 U.S. Dist. LEXIS 14274, at *7 (S.D.N.Y. July 13, 2005)
(vacating award of punitive damages where the record was devoid
of evidence that employer perceived that its termination of
employee would violate federal law); Robinson v. Instructional
Sys., 80 F. Supp. 2d 203, 210 (S.D.N.Y. 2000) (denying punitive
damages where the employer was found liable by a jury for
retaliation under Title VII, but the employer had believed that
its discriminatory actions were lawful), aff'd sub nom. Farias v.
Instructional Systems Inc., 259 F.3d 91 (2d Cir. 2001).

Moreover, CLS's decision to suspend an employee whom it
believed had failed to call in panic values, potentially causing
harm to patients and opening CLS up to client complaints and
liability, was not so egregious or outrageous as to warrant an
award of punitive damages. See Weissman, 214 F.3d at 236
(finding that employer's action is discriminatory, but not
egregious enough to support a punitive damages award, where
employer's actions were taken to protect itself from possible
long-term harm). Indeed, the fact that the jury only awarded

14

$11,000 in punitive damages -- a relatively small sum in comparison to the $200,000 award for emotional damages -- suggests that the jury disapproved of this suspension but did not find it to be wholly outrageous. Although the facts are sufficient to support the jury's verdict and its decision to award compensatory damages, it would be legal error to award punitive damages in the absence of outrageous or intentionally unlawful conduct.

Accordingly, defendant is granted judgment as a matter of law on the issue of punitive damages, and the $11,000 in punitive damages awarded by the jury will be struck from the verdict.


### (3)

### Remittitur of Compensatory Damages Award

**a.  Legal Standards**

Defendant seeks remittitur of the jury verdict awarding $200,000 in compensatory damages to Khan. Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." <u>Earl v. Bouchard Transp. Co.</u>, 917 F.2d 1320, 1328 (2d Cir. 1990) (quoting <u>Shu-Tao Lin v. Mc Donnell Douglas Corp.</u>, 742 F.2d 45, 49 (2d Cir. 1984)). <u>See also</u> Fed. R. Civ. P. 59.

A trial judge has discretion under Rule 59 of the Federal
Rules of Civil Procedure to overturn verdicts for excessiveness
and order a new trial "without qualification, or conditioned on
the verdict winner's refusal to agree to a reduction
(remittitur)." Rainone v. Potter, 388 F. Supp. 2d 120, 122
(E.D.N.Y. 2005) (citations omitted).  "While it is properly
within the province of the jury to calculate damages, there is
'an upper limit, and whether that has been surpassed is not a
question of fact with respect to which reasonable [persons] may
differ, but a question of law.'" Kim v. Dial Serv. Int'l, Inc.,
No. 96 Civ. 3327, 1997 U.S. Dist. LEXIS 12544, at *15 (S.D.N.Y.
Aug. 11, 1997) (quoting Mazyck v. Long Island R.R. Co., 896 F.
Supp. 1330, 1336. (E.D.N.Y. 1995)).  Thus, even though a court
will "accord substantial deference to the jury's determination of
factual issues," a judgment cannot stand "where the damages
awarded are so excessive as to shock the judicial conscience."
Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 683 (2d Cir.
1993) (citations and internal quotations omitted).  "While a jury
has broad discretion in measuring damages, it may not abandon
analysis for sympathy for a suffering plaintiff and treat an
injury as though it were a winning lottery ticket." Id. at 684
(citations and internal quotations omitted).

In calculating a remittitur, courts are instructed to use the "least intrusive standard" possible, namely "the maximum amount that would be upheld by the district court as not excessive." Martinez v. Port Authority of N.Y. and N.J., 445 F.3d 158, 160 (2d Cir. 2006); Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1330 (2d Cir. 1990); Singleton v. City of New York, 496 F. Supp. 2d 390, 394 (S.D.N.Y. 2007).

**b.    Evidence for Compensatory Damages Award**

According to Khan's trial testimony, he first went to see a psychiatrist on April 29, 2006, because "[a]fter the suspension, my depression was getting the better of me.  And I began to forget things.  Things weren't going good.  And I wanted to see a psychiatrist, anybody that would probably help me and pull me back to my normal stage."  Tr. at 324.  Khan's psychiatrist, Dr. Joseph Clerisme ("Clerisme"), also testified about Khan's psychiatric history at trial.  Clerisme's initial assessment of Khan stated:

> PRESENTING PROBLEM: This is a 49 year-old male who comes for
> evaluation on his own.  He complains of fatigue, middle
> insomnia, increased appetite, poor concentration, impaired
> memory, fear of losing his job.  He reports that he was
> doing well until October 95 when he was told that he could
> no longer work as a lab technician and was demoted to
> answering the phone.  In December 95 he was asked to sign a
> letter that he was on probation although he has been working
> for the company since 1969.  Since he refused to sign the
> letter, they have been putting pressure on him.  About three
> weeks ago, he was given a verbal warning that he would be
> fired if he made any mistakes.  He has been feeling

increasingly depressed since December and his symptoms got worse [a] few weeks ago.[3]

The assessment found that Khan "expresses feeling of helplessness, has occasional death wish, but denies suicidal ideation or intent." Clerisme diagnosed Khan with major depression and prescribed Wellbutrin and Ativan, medications for which he would alter the dosage depending on Khan's symptoms.

When Khan first visited Clerisme's office, he filled out a patient intake form, on which he indicated that his psychological problems had started due to his difficulties at work. See Khan Intake Form (Apr. 29, 1996), attached to Reibstein Aff. Ex. F. Khan wrote that his major problems at the time were "sleeplessness," "anxiety" and "forgetting things." He also filled out a list of symptoms that applied to him. These symptoms included headaches, being unable to relax, being unable to have a good time, eating problems, depression, fatigue, insomnia, nightmares, inability to make decisions, inferiority feelings, strange thoughts and feeling overwhelmed. Among the symptoms that he did not check off were "Sexual Problems," "Don't like weekends/vacations" and "Home conditions are bad." On a line asking whether Khan was "[a]lways worried about something," he responded: "job."

---

[3] All psychiatric records discussed in this section were submitted collectively as Plaintiff's Exhibit 41, and can be found as Reibstein Affidavit Exhibit F.

At trial, Khan testified that his subsequent transfer to a part-time position in Microbiology in May 1996 was "devastating" to him. Khan stated that "[t]he bottom fell out because I was paying for school, which I paid all on my own. And I had a wife and kids. And I lost so much money." Id. at 324-25. Khan testified that the job transfer left him "depressed," as evidenced by the fact that he stopped exercising, going out to do activities with his wife and children, or having relations with his wife. Id. at 325-26.

According to Khan's medical records, Khan visited Clerisme again on May 11, 1996. Clerisme's records indicate that "[p]atient feels better. His sleep has improved and he feels less tired. However, he feels nervous whenever he goes to work. He was given back his position as a l[a]b technician, but was placed on the evening shift. He feels that they changed his shift on purpose to retaliate against him since they know he goes to school in the evening." On June 12, 1996, Clerisme recorded that Khan had missed his last session and that "[h]e claims that he was doing well until he ran out of meds two weeks ago. Since then he complains of insomnia, nightmares, irritability, sadness. He lacks self confidence and feels that his co-workers are talking about him."

After Khan's next visit on June 26, 1996, Clerisme reported

that "[p]atient feels very distressed by the fact that his employer decided to decrease his job to part time. He has been feeling more depressed, claims that he sleeps only hours a day and he has nightmares. Patient appears more anxious and preoccupied. He feels overwhelmed and expresses death wish." On July 24, 1996, Clerisme reported that Khan "was doing better until last week when he ran out of medications. He sleeps better and his nightmares are less frequent." However, Khan was "still preoccupied by the fear of losing his job and believes they are looking for excuse[s] to fire him."

Although Khan first sought psychiatric care shortly after his week-long suspension in April 1996, his medical records show that his work-related emotional distress persisted long after that suspension. Clerisme's records as submitted by plaintiff continue until March 4, 2000. Throughout this time, Khan told his doctor that he feared losing his job, particularly after his multiple transfers. Khan's medical records show a series of improvements and declines in his mental health, with the declines often attributed to some form of stress or anxiety originating at his workplace. These records show that Khan's work-related emotional distress was more related to lawful actions for which his employer is not liable, including his job transfers in May 1996 and March 1997.

**c.  The Jury Award Encompasses Damages for Which Plaintiff May Not Recover**

Although CLS concedes that Khan suffered emotional distress from its actions, see, e.g., Def.'s Mem. at 19, it contends that the jury award is excessive because it reflects compensation for all of Khan's emotional distress, even though only part of this distress is fairly attributable to the five-day suspension.  CLS claims that most of Khan's job-related emotional distress was caused by his job transfers and schedule changes.  CLS presented evidence at trial to show that Khan's prior lab technician position was rendered obsolete by new technology.  See Tr. at 85-87.  In addition, CLS explained that regulatory changes in the mid-to-late 1990s led it to lay off most of its technicians in favor of "technologists," who had "a much higher level of education and skill [than technicians] and also did not require direct supervision."  Tr. at 68, 71.  Khan was shifted to a part-time technician position because he lacked the educational qualifications to be employed as a technologist.  See Tr. at 23-24, 178-79.  CLS also presented evidence to show that its employee transfers, including those that affected Khan, were made in accordance with union-mandated seniority rules.  See Tr. at 83-98.  In short, CLS provided sufficient evidence to show that it had legitimate business reasons for Khan's job transfers.  Accordingly, all of CLS's challenged actions, other than the

week-long suspension, were found lawful on summary judgment or by the jury at trial. Khan may not recover damages for emotional distress that resulted from those lawful actions. See <u>Kim v. Dial Serv.</u>, 1997 U.S. Dist. LEXIS 12544, at *43.

In support of its claim that the jury award is excessive, CLS points to Dr. Clerisme's initial psychiatric evaluation of Khan, which indicated that Khan's depression began as a result of his "demotion" in October 1995, suggesting that Khan's emotion distress was exacerbated, but not created, by the suspension. CLS also argues that its later actions, for which it is not liable, caused significantly greater emotional distress to Khan than the suspension. For example, Khan himself testified that his transfer to a part-time position in Microbiology in May 1996 was "devastating" and caused him to "bottom . . . out." CLS also observes that Khan marked off a number of symptoms on his psychiatric intake form but did not include "Sexual Problems," "Don't like weekends/vacations" or "Home conditions are bad." Khan filled out this form on April 29, 1996, within a month of his five-day suspension, suggesting that his later loss of interest in marital relations or activities with his family, <u>see</u> Tr. at 325-26, is not fairly attributable to the suspension itself.

In determining whether an emotional distress award was excessive, the court must, if possible, untangle the sources of that distress. A plaintiff is only entitled to compensatory damages for emotional distress that resulted from actions for which the defendant is actually liable. See McGrory, 2004 U.S. Dist. LEXIS 20425, at *52; Kim v. Dial Serv., 1997 U.S. Dist. LEXIS 12544, at *43. Indeed, this case is much like Ruhling v. Newsday, Inc., No. 04-cv-2430, 2008 U.S. Dist. LEXIS 38936, at *26 (E.D.N.Y. May 13, 2008), where the court granted a remittitur of $50,000 on a jury's $100,000 emotional distress damages award because "the jury rejected the majority of plaintiff's claims and [found] that she prevailed only on the least significant of the challenged employment actions, the reprimand." The court found that the plaintiff did suffer emotional distress from the defendant's unlawful action. But the court found it unlikely

> that the stress suffered by the plaintiff during the
> period 2002-2005 is wholly attributable to the
> reprimand [in January 2002] given that she continued to
> work for [defendant] through May 2005 and claimed to
> have suffered age and disability discrimination,
> harassment, a hostile working environment, retaliation
> and that she was constructively discharged during this
> period. These claims were rejected by the jury and the
> court cannot ignore that these events must have
> contributed at least in some degree to plaintiff's
> stress. The court must therefore parse out the stress
> caused by the reprimand from the other workplace events
> that followed.

Id. at *23.

Similarly, Khan's emotional distress cannot be wholly attributable to his five-day suspension.  Rather, Khan's psychiatrist's records and his own testimony at trial indicate that his depression and feelings of anxiety began prior to the suspension and were affected by other, more significant employment actions -- such as Khan's transfer to a part-time position -- that occurred both before and after the suspension. These other factors were all determined to be lawful on summary judgment or by the jury.  Accordingly, as in the above cases, some reduction in damages is necessary to reflect defendant's liability accurately.

Nonetheless, in asking for a reduction of compensatory damages to $12,000, CLS minimizes the extent of its liability. First, CLS minimizes the initial impact of Khan's suspension on his emotional health.  There is evidence that Khan's job-related depression began with his first transfer in October 1995, and Khan cannot recover damages for that earlier emotional distress. But Khan did not seek psychiatric treatment until immediately after his April 1996 suspension.  This suggests that the suspension significantly exacerbated any emotional distress Khan was already feeling.

Second, CLS claims that its liability should be limited to the "21-day window" between Khan's suspension on April 8, 1996

and his initial psychiatric treatment on April 29, 1996. CLS argues that any emotional distress after that date was caused by subsequent (and lawful) events, starting when CLS informed Khan on April 30, 1996 that he would be transferred to the Microbiology Department. But the jury could reasonably conclude that Khan's distress over the suspension continued even after the subsequent job transfers and pay cuts. Khan's suspension was not fully resolved until it was reduced by half through a union arbitration on January 15, 1998. See Reibstein Aff. Ex. E. Moreover, at trial Khan showed the jury a copy of the check he received after this arbitration. Khan testified that he never cashed the check, explaining that "I was suspended for something I didn't do. And that was never justified. I would never, ever cash that." Tr. at 314. The jury could reasonably find that this evidence showed that Khan's emotional distress over his suspension lingered long after the suspension itself.

In sum, the jury's $200,000 verdict, when viewed alongside other comparable cases, can only be interpreted as compensation for all of Khan's job-related emotional distress. This verdict is excessive because most of Khan's emotional distress was caused by actions for which he may not recover. But defendant's offer of $12,000 is plainly inadequate to cover the significant and lingering effects of this suspension on Khan's self-confidence

and emotional health.  Instead, as in <u>Ruhling</u>, a remittitur to $50,000 is appropriate to compensate Khan for all of the emotional distress that is reasonably related to the theory of liability on which he prevailed.  See <u>Ruhling</u>, 2008 U.S. Dist. LEXIS 38936, at *26 (reviewing cases setting similar emotional damages awards in the range of $50,000).

The next section of this opinion provides a closer look at the case law and confirms that, as in the <u>Ruhling</u> case, a $50,000 emotional damages award is appropriate here.

**d.   Compensatory Damages Awards in Comparable Cases**

In determining whether the jury's award shocks the judicial conscience, and what an appropriate damages award should be, a district court must look at awards granted in similar cases, "'bearing in mind that any given judgment depends on a unique set of facts and circumstances.'"  <u>Scala v. Moore McCormack Lines, Inc.</u>, 985 F.2d 680, 684 (2d Cir. 1993) (quoting <u>Nairn v. Nat'l R.R. Passenger Corp.</u>, 837 F.2d 565, 568 (2d Cir. 1988)).  Cases in the Second Circuit involving awards for emotional distress can generally be grouped into three categories of claims: "garden-variety," "significant" and "egregious."  <u>Rainone v. Potter</u>, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005) (citing Michelle Cucuzza, <u>Evaluating Emotional Distress Damage Awards to Promote Settlement</u>

of Employment Discrimination Claims in the Second Circuit, 65
Brook. L. Rev. 393, 427-28 (1999)).

At the lower end of the emotional distress damages spectrum
are cases involving "garden-variety" claims, in which damages
ranging from $5,000 to $35,000 are appropriate. Rainone, 388 F.
Supp. 2d at 122. In such cases, "'the evidence of mental
suffering is generally limited to the testimony of the plaintiff,
who describes his or her injury in vague or conclusory terms,
without relating either the severity or consequences of the
injury.'" McGrory v. City of New York, No. 99 Civ. 4062, 2004
U.S. Dist. LEXIS 20425, at *46 (S.D.N.Y. Oct. 8, 2004) (quoting
Bick v. City of New York, No. 95 Civ. 8781, 1998 U.S. Dist. LEXIS
5543, at *72-73 (S.D.N.Y. Apr. 21, 1998)). See, e.g., Carter v.
Rosenberg & Estis, P.C., No. 95 Civ. 10439, 1998 U.S. Dist. LEXIS
4010, at *68 (S.D.N.Y. Mar. 31, 1998) ($75,000 award remitted to
$15,000 because the original award "was based almost entirely on
the testimony of the plaintiff alone" without corroborating
evidence from a treating physician or other witness, and
plaintiff "gave no indication, or at least altogether inadequate
detail, as to the magnitude, duration, or severity of her mental
anguish" after she was terminated); Kim v. Dial Serv., 1997 U.S.
Dist. LEXIS 12544, at *40 ($300,000 award reduced to $25,000 in
light of "the sparse evidence introduced at trial regarding the

plaintiff's mental anguish"); Borja-Fierro v. Girozentrale Vienna Bank, No. 91 Civ. 8743, 1994 U.S. Dist. LEXIS 7088, at *9 (S.D.N.Y. May 26, 1994) (award for mental anguish resulting from job dismissal reduced from $160,000 to $15,000 where "[p]laintiff was the sole witness to his mental anguish," his testimony was "vague and conclusory" and he "failed to present sufficient evidence regarding the duration, severity or effects of his depression resulting solely from the dismissal").

Khan, however, has provided evidence of emotional distress that elevates his case above the "garden-variety" category. In particular, Khan has provided concrete medical testimony to illustrate his job-related emotional distress. There is credible evidence to suggest that his employer's actions led him to require anti-depressant medication and limited his life activities. Accordingly, a remittitur applying the "least intrusive standard" cannot reduce Khan's verdict to this "garden-variety" range.

Instead, Khan's claims are comparable to those cases in which "significant" damages of $50,000 to $100,000 have been awarded. "[Significant] claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony or evidence, evidence of treatment by a healthcare professional

and/or medication, and testimony from other, corroborating witnesses." Rainone, 388 F. Supp. 2d at 122-23 (quoting Cucuzza, 65 Brook. L. Rev. at 429). See, e.g., Perdue v. City University of New York, 13 F. Supp. 2d 326, 337 (E.D.N.Y. 1998) ($85,000 award upheld where plaintiff "testified that she felt disgraced, embarrassed, scared, and concerned that her future and reputation would be ruined" and "she experienced significant stress which aggravated a preexisting back condition, causing her to consult with a chiropractor and physician and to take pain killers"); Anderson v. YARP Restaurant, Inc., No. 94 Civ. 7543, 1997 U.S. Dist. LEXIS 560, at *24 (S.D.N.Y. Jan. 22, 1997) ($65,000 award upheld where plaintiff's therapist "testified that plaintiff suffered from emotional trauma -- including a sense of powerlessness, panic attacks, trouble sleeping, and difficulty maintaining employment -- as a result of the [sexual] harassment" and "[s]uch testimony was buttressed by plaintiff's own testimony that, for at least three years . . . she was unable to maintain employment, had trouble sleeping, and continued to fear she would be subjected to harassment again").

Because Khan is only entitled to damages stemming from his week-long suspension, however, his claim must fall at the bottom of this range of "significant" claims. Moreover, a review of cases at the high end of this $50,000 to $100,000 range shows

that such cases generally involve either physical manifestations
of mental anguish or more severe evidence of emotional distress
(such as suicidal ideation) than are present here.  See, e.g.,
Bick, 1998 U.S. Dist. LEXIS 5543, at *69 (reducing $750,000 award
to $100,000 where plaintiff's social work counselor testified
that plaintiff suffered from humiliation, anxiety, depression,
feelings of powerlessness, disrupted sleep, weight gain and
suicidal ideation).  Although Khan told his doctor that he
occasionally wished he were dead when he was diagnosed with
depression in April 1996, he also denied any suicidal ideation or
intent.  Tr. at 209.  Accordingly, a review of comparable
"significant" claims suggests that an award of $50,000 is the
largest jury verdict that would not shock the conscience of the
court.

Finally, it is clear that Khan's case does not fall within
the range of "egregious" cases where courts have upheld or
remitted awards for emotional distress to a sum in excess of
$100,000.  Such cases generally involve either "outrageous and
shocking" discriminatory conduct or a significant impact on the
physical health of the plaintiff.  Rainone, 388 F. Supp. 2d at
123 (citing Cucuzza, 65 Brook. L. Rev. at 429).  These cases also
"generally contain evidence of debilitating and permanent
alterations in lifestyle."  Id. at 124.  See, e.g., Ramirez v.

New York City Off-Track Betting Corp., 112 F.3d 38, 41 (2d Cir. 1997) (upholding jury award for $1,145,625 in damages for emotional distress under Title VII to discharged plaintiff whose job-related mental health injuries rendered him unemployable).

For example, in Shea v. Icelandair, 925 F. Supp. 1014 (S.D.N.Y. 1996), a $250,000 award was remitted to $175,000 where the emotional stress of being demoted and terminated induced the onset of the plaintiff's Parkinson's disease and heart problems. See id. at 1022.  Khan cites Shea to support the size of his emotional damages verdict.  But the Shea court stressed that "[t]he most important factor that sets this case apart from others involving emotional pain and suffering is the fact that [defendant's] discriminatory conduct had physical consequences." Id.  While Khan did suffer emotional distress due to his five-day suspension, there is no evidence to suggest that he suffered ill health effects remotely comparable to the plaintiff in Shea.

Khan contends that if a remittitur is appropriate, an award of $135,000 to $150,000 should be granted.  However, the cases which Khan cites in support of this amount are distinguishable, either because they involve plaintiffs who suffered significantly more severe emotional distress, or because they involved a far greater degree of culpable employer misconduct than the week-long suspension at issue here.

31

In _Ginsberg v. Valhalla Anesthesia Assoc., P.C._, No. 96 civ.
6462, 1997 U.S. Dist. LEXIS 16681, at *14 (S.D.N.Y. Oct. 28,
1997), the court reduced an emotional damages award from $500,000
to $100,000.  Although the mental health evidence in _Ginsberg_ may
be comparable to the current case, that plaintiff -- whose
employment was terminated, and who testified that she had lost
not only her job but her career -- suffered a significantly worse
adverse action than Khan, who was suspended for a week but has
never lost his employment.

Similarly, _McGrory v. City of New York_, 99 Civ. 4062, 2004
U.S. Dist. LEXIS 20425 (S.D.N.Y. Oct. 8, 2004), in which damages
for emotional distress were reduced from $533,390 to $100,000,
involved a plaintiff whose emotional distress rendered him unable
to work, and whose "emotional state deteriorated to such an
extent that he became eligible for Social Security permanent
partial disability payments." _Id._ at *17.  The psychiatrist in
_McGrory_ testified "that [plaintiff] was suicidal, that his
prognosis was extremely poor, and that he was unlikely ever to be
able to function in a work environment," _id._ at *18, all of which
are far more severe signs of emotional distress than are evident
in this case.  Moreover, the plaintiff in _McGrory_ lost his job,
whereas Khan was reprimanded and suspended for a week.  Khan
cites _McGrory_ as comparable to his case because that employer,

like CLS, could only be held liable for a portion of plaintiff's emotional injuries.  But the greater severity of both the retaliatory action and the employee's emotional distress shows that the $100,000 awarded in McGrory exceeds what would be appropriate here.

Zerilli v. New York City Transit Auth., 973 F. Supp. 311 (E.D.N.Y. 1997), cited by Khan, similarly illustrates that the current verdict is excessive.  In Zerilli, the court upheld a $95,000 jury award for pain and suffering.  But this jury award was "compensation for various physical ailments and mental stress caused by the [defendant's] discriminatory and retaliatory conduct."  Id. at 323 (emphasis added).  In contrast, there is no evidence here of significant physical ailments caused by Khan's suspension.  Moreover, the Zerilli jury found for plaintiff on four separate retaliation claims, involving incidents dating from May 1992 to May 1994, as well as on two separate discrimination claims.  Id. at 319.  The jury's compensatory damages award in Zerilli, therefore, covered the physical and emotional distress caused by two years of employer misconduct.  Here, however, CLS is only liable for a single retaliatory action.  Accordingly, Zerilli cannot support an award of comparable size in this case.

The other cases cited by plaintiff involving awards of $100,000 or above are also distinguishable.  Broome v. Biondi, 17

F. Supp. 2d 211, 226 (S.D.N.Y. 1997), upheld $114,000 in

emotional distress damages for each of two plaintiffs where the

jury found that these plaintiffs were denied housing on the basis

of their race.  The facts of this racial discrimination case are

entirely distinguishable from the current case.  Critically, the

sizable compensatory damages in <u>Broome</u> were awarded due to

willful and malicious conduct that also warranted a punitive

damages award of $410,000 to these plaintiffs.  <u>Id.</u> at 229.  In

contrast, as already noted in the punitive damages discussion

above, such outrageous behavior is absent from the current case.

<u>Zakre v. Norddeutsche Landesbank Girozentrale</u>, 541 F. Supp. 2d

555, 561 (S.D.N.Y. 2008), is similarly distinguishable as a case

where the employer's conduct was so egregious as to warrant

punitive damages under Title VII.

In <u>Petramale v. Local No. 17 of Laborers Int'l Union</u>, 847

F.2d 1009 (2d Cir. 1988), the court reduced a $200,000

compensatory damages award to $100,000, based on somewhat

comparable evidence of emotional distress.  <u>See</u> <u>id.</u> at 1013.  But

the facts in <u>Petramale</u> are entirely distinguishable from the

current case.  That plaintiff recovered after his union

disciplined him for allegedly making slanderous accusations

against union officials and disrupting a union meeting.  <u>Id.</u> at

1011.  This award for a union's violation of free speech under

the Labor Management Reporting and Disclosure Act is difficult to compare to a retaliation action under Title VII. In any event, even if the compensatory damages awards in these two cases were comparable, a $100,000 award for Khan would remain excessive in comparison to <u>Petramale</u> because, as already noted, the majority of Khan's job-related emotional distress was caused by his employer's lawful conduct.

In short, the cases cited by plaintiff confirm that compensatory damages of $100,000 or more are excessive based on the facts of this case. Instead, Khan's claims are comparable to those cases in which "significant" damages of $50,000 to $100,000 have been awarded. As already noted, Khan's damages cannot fall within the high end of the spectrum of "significant" claims. Moreover, many of the limitations on Khan's life activities, and his most severe incidents of depression, were caused by actions for which his employer cannot be held liable. Accordingly, the largest jury verdict that would not shock the conscience of the court must lie at the bottom of this range.

Therefore, applying the "least intrusive standard" to this remittitur motion, Khan is entitled to $50,000 in compensatory damages for his emotional distress.

## Conclusion

For the reasons explained above, defendant's Rule 50(b) motion for judgment as a matter of law on plaintiff's Title VII retaliation claim is denied.  Defendant's motion for judgment as a matter of law on punitive damages is granted, and the $11,000 punitive damages award is struck from the jury verdict. Defendant's Rule 59 motion for a new trial on compensatory damages is denied, conditioned upon plaintiff's written acceptance of an order of remittitur within thirty days reducing the damages award to $50,000.


Dated:  Brooklyn, New York
        September 17, 2008


                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge